## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **DALE T. KENNEDY,** | ) | |
| Plaintiff | ) | Civil Action No. 2:21cv00025 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | | |

### I. Background and Standard of Review

Plaintiff, Dale T. Kennedy, ("Kennedy"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Kennedy protectively filed his application for DIB on November 7, 2018, alleging disability as of January 1, 2017, based on anxiety; syncope; low back pain that radiates into his feet; chronic pain; physical nerve problems; gout; arthritis; diabetes; heart problems; difficulty concentrating and focusing; irritability; problems standing and sitting for long periods; and difficulty sleeping. (Record, ("R."), at 10, 199-200, 237, 289, 293, 318.) The claim was denied initially and upon reconsideration. (R. at 129-32, 137-40, 144-47.) Kennedy then requested a hearing before an administrative law judge, ("ALJ"). (R. at 149-50.) The ALJ held a hearing on December 18, 2020, at which Kennedy was represented by counsel. (R. at 60-92.)

By decision dated January 12, 2021, the ALJ denied Kennedy's claim. (R. at 10-29.) The ALJ found Kennedy meets the nondisability insured status requirements of the Act for DIB purposes through December 31, 2024. (R. at 13.) The ALJ found Kennedy had not engaged in substantial gainful activity since January 1, 2017,[2] the alleged onset date.[3] (R. at 13.) The ALJ determined Kennedy had severe impairments, namely, degenerative disc disease; gout; osteoarthritis; coronary artery disease; diabetes mellitus; syncope; and obesity, but he found Kennedy did not have an impairment or combination of impairments that met or medically equaled one of

---

[2] Therefore, Kennedy must show he was disabled between January 1, 2017, the alleged onset date, and January 12, 2021, the date of the ALJ's decision, to be eligible for benefits.

[3] The ALJ noted that Kennedy worked after the alleged disability onset date, but this work did not rise to the level of substantial gainful activity. (R. at 13.)

the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13, 16.) The ALJ found Kennedy had the residual functional capacity to perform light work,[4] except he could have no exposure to unprotected heights, such as ladders, ropes or scaffolds; he could occasionally climb, stoop, kneel, crouch and crawl; and he could have occasional exposure to temperature extremes, humidity, vibrations and pulmonary irritants, such as fumes, odors, dusts, gases and poorly ventilated areas. (R. at 18.) The ALJ found Kennedy was unable to perform any of his past work. (R. at 27.) Based on Kennedy's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Kennedy could perform, including the job of a general sales clerk. (R. at 27-28, 87.) Thus, the ALJ concluded Kennedy was not under a disability as defined by the Act from January 1, 2017, through the date of the decision, and he was not eligible for DIB benefits. (R. at 28.) *See* 20 C.F.R. § 404.1520(g) (2021).

After the ALJ issued his decision, Kennedy pursued his administrative appeals, (R. at 193-94, 391-92), but the Appeals Council denied his request for review. (R. at 1-5.) Kennedy then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2021). This case is before this court on Kennedy's motion for summary judgment filed December 9, 2021, and the Commissioner's motion for summary judgment filed December 30, 2021.

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2021).

*II. Facts*

Kennedy was born in 1963, (R. at 27, 199), which, on the alleged onset disability date, classified him as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d), and on the date of the ALJ's decision, classified him as a "person of advanced age" under 20 C.F.R. § 404.1563(e). Kennedy has some college education and past work experience as the owner and operator[5] of The Clapboard House, a home furnishing store, which involved an array of managerial and sales duties, as well as installing furniture and window treatments. (R. at 49-50, 67, 238.) He testified at his hearing that he was at the store daily to check on things, such as bills, monthly tax reports and recent sales, but he no longer was actively working and installing window treatments. (R. at 70, 72, 75, 79.) Kennedy stated he was in the store 15 to 16 hours a week and spent most of this time in a reclined position due to his back and leg problems. (R. at 75-76.)

Kennedy reported he could perform light household chores; shop in stores and online; read and watch television daily; attend church by Zoom weekly; and spend time with others by way of telephone, in person or by text. (R. at 42, 44.) He stated he had no problems with getting along with others, including authority figures; he could follow written instructions, if there were no distractions; he was unable to follow spoken instructions "well" and would need for them to be in writing so he could refer back to them; stress caused him anxiety, which required him to walk away from the situation; and he would become "unhinged" with changes in routine because he was "not as diplomatic as he used to be." (R. at 44-46.)

---

[5] The vocational expert classified Kennedy's work as an interior decorator; a furniture assembler and installer; a furniture salesperson; a curtains and draperies salesperson; and a retail store manager. (R. at 86.) He testified that Kennedy's skills would transfer to the job as a sales clerk. (R. at 87.)

In rendering his decision, the ALJ reviewed records from Daniel Walter, Psy.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Louis Perrott, Ph.D., a state agency psychologist; Dr. William Rutherford, Jr., M.D., a state agency physician; Mountain States Medical Group, ("MSMG"); Norton Community Hospital; Indian Path Medical Center; Holston Valley Medical Center, ("Holston Valley"); Blue Ridge Neuroscience Center, P.C., ("Blue Ridge"); Johnston Memorial Diabetes Care Center; Boulder City Hospital; Wellmont Spine and Rehab; and Community Physicians Oncology.

By way of background, Kennedy participated in pain management at MSMG since 2012 for his complaints of low back pain, sacroiliac, ("SI"), joint pain and foot pain, which were conservatively managed with medications, SI joint injections and physical therapy. (R. at 587-630.) In 2014, due to an abnormal calcium score with a history of hypertension, diabetes and ongoing tobacco use, Kennedy underwent a cardiac catheterization and stent placement. (R. at 397-99.) In 2015, a nuclear stress test showed no evidence of ischemia or infarction. (R. at 639.)

Throughout 2016 and 2017, Kennedy was treated by Dr. Matthew Cusano, M.D., and Vada Rose, N.P., a physician and nurse practitioner at MSMG, for right hip pain, foot, low back and knee pain. (R. at 1041, 1071, 1085, 1113, 1127.) In February 2016, x-rays of Kennedy's right femur showed mild degenerative change at the knee, and x-rays of his right hip were normal. (R. at 1423, 1425.) During this time, Kennedy reported his diabetes was asymptomatic,[6] his coronary heart disease was stable, and he had anxiety, but no depression. (R. at 1040-41, 1055-56, 1071-72, 1085-86, 1113-14, 1127-28.) He denied dizziness; confusion; upper and lower

---

[6] In November 2016, Dr. Cusano reported that Kennedy's diabetes was uncontrolled, but Kennedy refused insulin. (R. at 1079.) Instead, Kennedy stated he planned to control his diabetes with an aggressive diet and exercise. (R. at 1079.)

extremity pain, paresthesias and weakness; depression; and anxiety. (R. at 1028, 1003-04, 1018, 1028, 1041.)  Kennedy's examinations regularly showed he was in no acute distress; his pulmonary and cardiological examinations were normal; his extremities had no edema; his neck had full range of motion; his back had no tenderness and full range of motion; he had a normal gait and station; his right foot had no restriction or pain on range of motion; his motor strength and tone were normal; he had no involuntary movements or muscle atrophy; he was fully oriented; he exhibited no obvious mood disorder; and his mood and affect were appropriate. (R. at 1010-11, 1024, 1034-35, 1048, 1063, 1078, 1092, 1105, 1120, 1134, 1150-51.)

On April 7, 2017, an MRI of Kennedy's lumbar spine showed multilevel spondylosis; severe loss of disc height at the L4-L5 level with moderate central canal and bilateral lateral recess stenosis, moderate right and mild left neural foraminal stenosis; and curvature of the lumbar spine. (R. at 1413.) An MRI of Kennedy's cervical spine showed mild left neural foraminal stenosis, secondary to degenerative disease at the C4-C5 disc; a broad-based disc protrusion at the C5-C6 disc with moderate central canal stenosis, mild bilateral lateral recess stenosis and mild right and moderate left neural foraminal stenosis secondary to degenerative disease; and a broad-based disc protrusion causing mild stenosis at the C6-C7 disc; mild central canal stenosis; and moderate to severe left neural foraminal stenosis, secondary to degenerative disease at the uncovertebral joint. (R. at 1416-17.) An MRI of Kennedy's thoracic spine showed a small broad-based disc protrusion in the right lateral recess of the T7-T8 disc without significant stenosis. (R. at 1411.)

On May 5, 2017, Kennedy saw Dr. David M. Pryputniewicz, M.D., a neurosurgeon with Blue Ridge, for cervical and lumbar pain and weakness. (R. at 812.) Kennedy stated his low back pain radiated into his hips, bilaterally, and

extended into his thighs, calves and occasionally into his entire foot. (R. at 812.) He stated he did a "big job in January 2017," which exacerbated his symptoms. (R. at 812.) He stated he had not missed any work due to his symptoms. (R. at 812.) Kennedy reported he received no lasting relief from injections or physical therapy and was interested in further treatment options. (R. at 812.) Upon examination, Kennedy's motor function and sensation were intact, and his reflexes were symmetric. (R. at 814.) Dr. Pryputniewicz recommended a lumbar decompression at the L4-L5 level. (R. at 814.)

On August 24, 2017, Kennedy underwent an L4-L5 bilateral laminectomy, medial facetectomy and L5 foraminotomy. (R. at 788-90.) On September 12, 2017, Kennedy reported that his preoperative symptoms had improved but he continued to experience low back pain and lower extremity numbness following prolonged sitting. (R. at 804.) He reported that he was "back to doing paperwork with his job as a home décor salesman." (R. at 804.) On December 19, 2017, Kennedy reported continued low back pain and tingling down his legs. (R. at 798.) Kennedy reported rehabilitation therapy and medications were helpful. (R. at 798.) Kennedy was in no acute distress; he had positive provocative testing of the SI joints; he had lumbar paraspinal muscle tenderness, but his spine had normal range of motion; his bilateral lower extremities had no tenderness to palpation and normal range of motion; his bilateral upper and lower extremities had normal strength and reflexes; he had intact sensation; his gait and station were normal; and he was able to stand without difficulty. (R. at 800-01.)

On February 16, 2018, Kennedy saw Rose, and reported right wrist pain. (R. at 979.) Kennedy's wrist had pain with range of motion; he had no edema, warmth or redness; and normal strength and grip. (R. at 986.) X-rays of Kennedy's right wrist showed minimal degenerative arthropathy. (R. at 1380.)

On April 4, 2018, Kennedy saw Dr. Matthew Beasy, M.D., a physician with Johnston Memorial Diabetes Center, and reported sensory abnormality of the foot, but denied dizziness, fainting, muscle pain or aches and calf pain with walking. (R. at 837.) Kennedy's diabetic foot exam showed perception at the great toe distal interphalangeal, ("DIP"), joint. (R. at 837-38.) Dr. Beasy reported Kennedy's diabetes was uncontrolled. (R. at 838.) He reported Kennedy's A1C level was at 9.6 percent, and Kennedy was encouraged to eat better, exercise and to lose weight. (R. at 839-40.) Dr. Beasy prescribed Metformin. (R. at 839.)

On May 16, 2018, Kennedy saw Dr. Cusano, and reported thumb pain. (R. at 954.) Kennedy had painful range of motion and some restriction of the right thumb. (R. at 962.) He reported his right thumb pain had improved somewhat and he did not want an orthopedic referral. (R. at 962.) On July 17, 2018, Rose saw Kennedy for a preoperative examination to clear him for carpal tunnel release surgery. (R. at 938.) He reported he was doing well. (R. at 938.) He did not report any symptoms associated with anxiety, and denied anxiety and depression. (R. at 939.) Kennedy reported low back pain, and Rose ordered an MRI of Kennedy's lumbar spine. (R. at 948.) Kennedy was in no acute distress; his pulmonary and cardiological examinations were normal; his extremities had no edema; his neck had full range of motion; his back had no tenderness and full range of motion; he had a normal gait and station; his motor strength and tone were normal; he had no involuntary movements or muscle atrophy; he was fully oriented; he exhibited no obvious mood disorder; and his mood and affect were appropriate. (R. at 946-47.)

On July 30, 2018, an MRI of Kennedy's thoracic spine showed a small right paracentral disc protrusion at the T7-T8 level, mild multilevel degenerative disc disease and epidural fibrosis. (R. at 794.) That same day, an MRI of Kennedy's cervical spine showed narrowing at the C5-C6 and C6-C7 with diffuse disc

desiccation; mild degenerative disc disease without disc herniation at the C3-C4 level; degenerative changes in the C4-C5 disc without focal herniation; a broad-based disc osteophyte of the C5-C6 disc that mildly impinges on the ventral and cervical cord with a mild to moderate central canal stenosis and moderate to severe bilateral foraminal stenosis; disc osteophyte complex impinging on the cervical cord with a moderate central canal stenosis at the C6-C7 level and a patent right neural foramen with severe stenosis in the left neural foramen; and a central disc protrusion with effacement of the subarachnoid space at the C7-T1 level with mild central canal stenosis. (R. at 1371-72.) An MRI of Kennedy's lumbar spine showed diffuse disc space narrowing and desiccation throughout with the greatest change at the L4-L5 level; mild degenerative changes at the L2-L3 and L5-S1 levels without focal herniation or foraminal stenosis; degenerative change at the L3-L4 level and mild narrowing of the neural foramen; and a broad-based circumferential bulging of the L4-L5 disc with effacement of the ventral thecal sac with mild to moderate central canal stenosis with findings of postsurgical changes and epidural fibrosis. (R. at 1374-75.)

On August 14, 2018, Dr. Pryputniewicz saw Kennedy for re-evaluation of increased low back pain. (R. at 791-95.) Kennedy reported doing well following his previous bilateral lumbar decompression surgery but had begun experiencing increased back pain. (R. at 791.) He denied any specific injury or trauma but stated he had been very busy since his surgery with his design business. (R. at 791.) Kennedy reported that he did return to work, but he avoided any heavy lifting. (R. at 791.) He reported rehabilitation and medications were helpful. (R. at 791.) Kennedy's examination findings remained unchanged. (R. at 793-94.) That same day, x-rays of Kennedy's lumbar spine showed mild degenerative disc changes with minimal retrolisthesis at the L2-L3 level. (R. at 796.) X-rays of Kennedy's bilateral hips were normal. (R. at 797.)

On September 5, 2018, Dr. Paul L. Jett, M.D., a physician with Holston Valley, saw Kennedy for his complaints of lower back pain. (R. at 857.) He reported his pain was worsened by sitting and bending and relieved by standing. (R. at 858.) Kennedy reported he was able to perform self-care, household chores, work at his job, shop and walk for exercise. (R. at 859.) He denied a history of mental illness. (R. at 859.) Kennedy's lumbar back exhibited decreased range of motion and tenderness; his bilateral lower extremities had no edema or deformity; his bilateral reflexes were 1+; his bilateral hips demonstrated a positive Faber test; his back range of motion exhibited abnormal extension and rotation; his straight leg raising tests were negative; he had normal muscle bulk, tone and strength; he had intact sensation; his gait was normal; he was fully oriented; and his mood, affect, behavior, judgment and thought content were normal.[7] (R. at 860-62.) Dr. Jett diagnosed lumbar stenosis with neurogenic claudication; SI joint pain; facet degeneration of the lumbosacral region; degeneration of the lumbar intervertebral disc; and post laminectomy syndrome of the lumbar region. (R. at 863.) Kennedy was scheduled to return for an SI joint injection, which was performed on September 21, 2018.[8] (R. at 863, 1515.)

On September 19, 2018, Kennedy saw Dr. Beasy, and reported his anxiety had increased following surgery, but he denied suicidal ideations. (R. at 817-18.) Kennedy's diabetic foot exam showed perception at the great toe DIP joint. (R. at 825.) Dr. Beasy reported Kennedy's diabetes was uncontrolled. (R. at 825.) He reported Kennedy's A1C level was at 9.6 percent, noting Kennedy had not been on his medication. (R. at 826-27.) Kennedy was encouraged to eat better, exercise and to lose weight. (R. at 826.)

---

[7] On October 10, 2018, Kennedy reported his symptoms had improved 20 percent since having the injection, and Dr. Jett's examination findings remained unchanged. (R. at 864-67.)

[8] On February 27, 2019, March 12, 2019, April 11, 2019, and May 7 and 15, 2019, Kennedy underwent lumbar medial branch blocks at the L2-L3 and L4-L5 levels. (R. at 1507-12.) On June 20, 2019, Kennedy underwent a radiofrequency nerve ablation on the left. (R. at 1634.)

On September 19, 2018, Dr. Joseph A. Brown, II, M.D., a gastroenterologist with MSMG Gastroenterology, saw Kennedy for fatty liver disease. (R. at 1498.) Kennedy and no complaints and reported he was asymptomatic, he worked hard and worked out on a regular basis. (R. at 1498.) His examination findings were normal. (R. at 1498-99.) Dr. Brown found that Kennedy had fatty liver disease with the risk factors of weight diabetes and hyperlipidemia, and he encouraged Kennedy to watch his diet, exercise and to work on controlling his lipid and sugar levels. (R. at 1499.)

On October 15, 2018, Kennedy saw Dr. Cusano, and reported neck pain. (R. at 912.) Kennedy's neck had full range of motion; his back had no tenderness and full range of motion; he had a normal gait and station; he had normal motor strength and tone; he had no involuntary movements or muscle atrophy; his bilateral upper and lower extremities had no ischemia; he was fully oriented; he had no obvious mood disorder; and his affect was appropriate.[9] (R. at 921.) On October 16, 2018, Kennedy saw Dr. Robert McQueen, M.D., a physician with MSMG, and reported that, from a cardiac standpoint, he felt well with no chest pain or shortness of breath. (R. at 1444.) His examination findings remained unchanged from the previous day. (R. at 1451-52.) On October 30, 2018, Kennedy saw Dr. Cusano and reported chest pressure on a recent airline flight and passing out the previous week. (R. at 909-10.) According to Kennedy, he sought treatment at an emergency department and testing showed no sign of cardiac involvement. (R. at 910.)

On October 26, 2018, Kennedy presented to the emergency department at Boulder City Hospital for complaints of experiencing a syncopal episode after exerting himself.[10] (R. at 871-84.) Kennedy's examination findings were normal,

---

[9] Kennedy's examination findings were generally the same throughout 2018. (R. at 897, 946-47, 971-72, 997-98, 1451-42, 1821.)

[10] Kennedy experienced this syncopal episode while on vacation. (R. at 888, 909, 1813.)

including his musculoskeletal and neurological examinations. (R. at 873.) Kennedy's lab results were appropriate, and he had no corresponding EKG changes. (R. at 875.) He was diagnosed with syncope. (R. at 875.) A CT scan of Kennedy's chest performed on October 30, 2018, showed heavy coronary artery calcification. (R. at 1364-65.)

On November 15, 2018, Kennedy saw Dr. Cusano, and reported he had not experienced any further episodes of syncope and he denied chest pain and pressure. (R. at 898.) On December 3, 2018, an echocardiogram showed left ventricle ejection of 55 percent, which was described as normal. (R. at 1433-34.) On December 18, 2018, Kennedy reported he had not experienced any further episodes of syncope and he denied lightheadedness and dizziness. (R. at 1813.)

On March 19, 2019, Dr. Brown saw Kennedy for a routine follow up pertaining to his fatty liver diagnosis. (R. at 1496.) Kennedy reported he continued to lose weight and was doing well, and he had no specific complaints. (R. at 1496.) His abdomen had no significant hepatomegaly, and his spleen was not enlarged. (R. at 1496.) Dr. Brown noted Kennedy had fatty liver disease and very severe hyperlipidemia. (R. at 1496.) He ordered an ultrasound of Kennedy's liver. (R. at 1496.) On April 9, 2019, an ultrasound of Kennedy's liver showed a fatty enlarged liver. (R. at 1501.)

On March 19, 2019, Kennedy saw Dr. Beasy, and denied dizziness, fainting, sensory abnormalities of the foot, muscle pain or aches, calf pain with walking, and blisters, skin sores and calluses on his feet. (R. at 1487.) His examination findings were normal, and his diabetic foot exam showed perception at the great toe DIP joint. (R. at 1487-88.) Kennedy's A1C level was 9.4 percent. (R. at 1488, 1490.) Dr. Beasy

reported Kennedy's diabetes was uncontrolled, but Kennedy refused insulin. (R. at 1488.)

On June 25, 2019, Kennedy saw Rose, and reported his diabetes was asymptomatic and his coronary artery disease was stable. (R. at 1603.) He reported excessive worry and muscle tension. (R. at 1604.) Kennedy stated he adopted a cat to keep at work, which helped him cope and get through the workday. (R. at 1614.)

On July 18, 2019, Daniel Walter, Psy.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding Kennedy had no limitations in his ability to understand, remember or apply information; to interact with others; and to adapt or manage himself. (R. at 102-03.) He found that Kennedy had mild limitations in his ability to concentrate, persist or maintain pace. (R. at 102.) Walter found Kennedy's anxiety and obsessive-compulsive disorders were nonsevere. (R. at 102.) Walter noted Kennedy's diagnosis of asymptomatic anxiety disorder, not otherwise specified, but found his documented mental status examinations were normal and he had no significant mental complaints. (R. at 102.) On January 23, 2020, Louis Perrott, Ph.D., a state agency psychologist, completed a PRTF which mirrored that of Walter from July 18, 2019. (R. at 119-20.) Perrott noted Kennedy's diagnosis of anxiety disorder but found his condition to be nonsevere, as it resulted in no more than mild functional impairments. (R. at 120.)

On July 18, 2019, Dr. Robert McGuffin, M.D., a state agency physician, completed a medical assessment, finding Kennedy could perform light work. (R. at 104-106.) He found Kennedy could stand, walk and sit six hours each in an eight-hour workday; push/pull as much as the lift/carry restrictions; frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; and never climb ladders, ropes and scaffolds. (R. at 104-05.) Dr. McGuffin found Kennedy had no

manipulative, visual or communicative limitations. (R. at 105.) He found Kennedy should avoid concentrated exposure to vibration and hazards, such as machinery and heights. (R. at 105.) On January 23, 2020, Dr. William Rutherford, Jr., M.D., a state agency physician, completed a medical assessment, which mirrored that of Dr. McGuffin, except he found Kennedy should avoid concentrated exposure to temperature extremes, vibration, fumes, odors, dusts, gases, poor ventilation and hazards, such as machinery and heights. (R. at 122-23.)

On July 18, 2019, Kennedy saw Dr. Jett, and reported 50 percent relief from the radiofrequency ablation, but he complained of pain radiating down both legs. (R. at 1631.) Kennedy's right shoulder and lumbar back had decreased range of motion and tenderness; he was fully oriented; his mood and affect were normal; he had a normal gait; he had abnormal lumbar range of motion; his muscle strength was normal; his straight leg raising tests were negative; and he had normal sensation. (R. at 1633.)

On August 15, 2019, Nina Tarlton, F.N.P., a family nurse practitioner with Holston Valley, saw Kennedy for his complaints of low back pain that radiated into his back, buttock, bilateral hips, bilateral thighs and bilateral legs. (R. at 1627-28.) Kennedy reported he could perform self-care, household chores, work at his job, shop, participate in hobbies, sleep at night and walk for exercise, but he could not perform yard work. (R. at 1628.) Kennedy had tenderness in the lumbar region with decreased range of motion; he had negative straight leg raising tests; he had normal motor strength and sensation; his gait was normal; and he was fully oriented. (R. at 1629.) Kennedy's diagnosis included lumbar stenosis with neurogenic claudication, SI joint pain and SI dysfunction of the left side. (R. at 1630.)

In January and February 2020, Kennedy was seen at Community Physicians Oncology for chronic thrombocytopenia;[11] diabetes mellitus; renal insufficiency and enlarged liver. (R. at 1661-63, 1685-97.) Kennedy had a normal gait; he was fully oriented; his memory was intact; he had a normal affect; and his insight and judgment were normal. (R. at 1662, 1692.) An ultrasound of Kennedy's abdomen was ordered. (R. at 1693.) On February 13, 2020, an ultrasound of Kennedy's abdomen showed fatty infiltration and enlarged spleen. (R. at 1668.)

On March 10, 2020, Rose saw Kennedy, and reported he was in no acute distress; his pulmonary and cardiological examinations were normal; his extremities had no edema; and he had tenderness in the lumbar spine with painful range of motion. (R. at 1712.) When Rose addressed Kennedy's diabetes, he stated he continued to eat out without being mindful of his diet. (R. at 1714.) Kennedy was offered and refused bolus insulin[12] because it did not "fit with his erratic schedule." (R. at 1714.)

On April 13, 2020, Rose completed a mental assessment, indicating that Kennedy had a slight limitation, but could generally function well, in his ability to relate predictably in social situations. (R. at 1839-41.) She opined Kennedy had serious limitation, resulting in unsatisfactory work performance, in his ability to deal with work stresses. (R. at 1839.) Otherwise, Rose found that Kennedy had no limitations on his ability to make occupational, performance and personal/social adjustments, but found that he would be absent from work more than two days a

---

[11] Thrombocytopenia is when you do not have enough platelets, cells in your blood that stick together to help it clot. *See* https://www.webmd.com/a-to-z-guides/thrombocytopenia-causes-treatment (last visited Aug. 26, 2022).

[12] Bolus insulin is taken at mealtimes to keep blood glucose levels under control following a meal. *See https://www.medicalnewstoday.com/articles/316616#what-is-basal-insulin* (last visited Aug. 28, 2022).

month. (R. at 1839-41.) Rose noted that Kennedy's limitations were physical. (R. at 1840.)

That same day, in a letter to Kennedy's attorney, Rose stated it would be difficult for Kennedy to continue working due to neck and back pain, as his pain is worsened after working. (R. at 1838.) She stated she did not "think [Kennedy] will be able to continue working." (R. at 1838.)

On July 7, 2020, Kennedy saw Rose, and reported he generally followed an unhealthy diet. (R. at 1849.) His hypertension had improved and was stable. (R. at 1849.) Kennedy denied symptoms of anxiety but stated that, when he did experience symptoms, they were mild and only occurred occasionally. (R. at 1850.) Kennedy had pain in his lumbar spine; his cardiological and pulmonary examinations were normal; he was fully oriented; and his mood, affect and behavior were normal. (R. at 1852.) On August 21, 2020, Kennedy saw Serena P. Blevins, N.P., a nurse practitioner with MSMG, and reported his SI injections had provided good relief for four months, but his back pain had returned. (R. at 2001.) Kennedy stated he could perform self-care, household chores, work at his job and shop and he was able to sleep at night. (R. at 2002.) Kennedy had a normal gait. (R. at 2003.) Blevins ordered repeat SI injections. (R. at 2003.) On October 5, 2020, Blevins ordered a lumbar radiofrequency ablation. (R. at 2007.) On November 16, 2020, Kennedy saw Blevins, and reported increased tension and difficulty sleeping. (R. at 2008.) He stated he was working seven days a week. (R. at 2008.) Kennedy reported good relief from the radiofrequency ablation. (R. at 2008.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider

whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Kennedy argues the ALJ erred by improperly determining his residual functional capacity by failing to properly consider the opinions of Rose and by giving controlling weight to the opinions of the state agency consultants. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) Kennedy contends the state agency consultants' assessments were "stale [and] outdated." (Plaintiff's Brief at 6.)

Kennedy filed his application in November 2018; thus, 20 C.F.R. § 404.1520c governs how the ALJ considered the medical opinions here.[13] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimants' medical sources. 20 C.F.R. § 404.1520c(a) (2021). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2021) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2021).

_____

[13] 20 C.F.R. § 404.920c applies to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. § 404.1520c(b)(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1) (2021). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2) (2021). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[14] *See* 20 C.F.R. § 404.1520c(b)(2).

Kennedy argues the ALJ erred by improperly determining his residual functional capacity by failing to properly consider the opinions of Rose and by giving controlling weight to the opinions of the state agency consultants. (Plaintiff's Brief at 5-6.) A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 404.1545(a) (2021). The ALJ found Kennedy had the residual functional capacity to perform light work, except he could have no exposure to unprotected heights, such as ladders, ropes or scaffolds; he could occasionally climb, stoop, kneel, crouch and crawl; and he could have occasional exposure to temperature extremes, humidity, vibrations and

---

[14] An exception to this is when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(b)(3) (2021).

pulmonary irritants, such as fumes, odors, dusts, gases and poorly ventilated areas. (R. at 18.)

The ALJ stated he found Rose's April 2020 opinions in which she opined that that it would be difficult for Kennedy to continue working due to neck and back pain, that he was markedly limited in dealing with work stresses and that he would be absent from work more than two days per month due to his impairments unpersuasive. (R. at 25.) The ALJ noted that, in her mental assessment, Rose stated Kennedy's "limitations are physical" and she did not identify any significant mental limitations. (R. at 25.) However, the ALJ also stated that he found Rose's opinion that Kennedy did not have significant mental limitations to be supported and consistent with the other medical evidence of record. (R. at 25.) He found that Rose's statement to the effect that Kennedy was unable to continue working was a statement on an issue reserved to the Commissioner and was not inherently valuable nor persuasive. (R. at 25.) The ALJ is solely responsible for determining a claimant's residual functional capacity. *See* 20 C.F.R. § 404.1546(c) (2021); *see also* 20 C.F.R. § 404.1527(d)(2) (2021) (a claimant's residual functional capacity is an issue reserved exclusively to the Commissioner). The ALJ further found the remainder of Rose's opinion to be unpersuasive because it was unsupported and inconsistent with the other evidence. The ALJ noted that Rose did not provide any narrative rationale for the proposed "marked" limitation and estimated rate of absenteeism. In addition, Rose's statement that Kennedy's pain was worse despite treatment was inconsistent with multiple statements to the contrary noted throughout the record. (R. at 25.)

The ALJ found the state agency physicians' physical assessment mostly persuasive as their assessments were consistent with the other evidence. (R. at 25.) However, the ALJ found the limitation on exposure to hazards had not been adopted in its entirety, as it is not well-explained or supported. (R. at 26.) The ALJ noted that

in recent encounters, Kennedy did not report any significant medication side effects and appeared alert and oriented on examination. (R. at 26.) Therefore, the ALJ stated the proposed hazards limitation was not adopted in is entirety, but he found that Kennedy should avoid exposure to unprotected heights based on his cardiac issues, history of syncope, chronic pain issues and diabetes. (R. at 26.)

The ALJ found the state agency psychologists' mental assessments persuasive as they are supported in that both consultants aptly considered that mental status examination findings were generally normal in the setting of routine medication management and that his activities of daily living appeared limited primarily due to physical conditions. (R. at 26.) He found their assessments were consistent with the other evidence showing that Kennedy's overall mental status remained grossly intact with routine treatment, despite complaining of increased anxiety from time to time. (R. at 26.)

The ALJ noted that, although Kennedy reported worsening back and lower extremity symptoms in May 2017, he was still "working full-time as a home décor salesperson," and had not missed any work due to his symptoms. (R. at 21.) In September 2017, less than one month after Kennedy's lumbar spine surgery, he was noted to be "back to doing paperwork with his job as a home décor salesman," though he reported some residual numbness with prolonged sitting. (R. at 21.) By December 2017, Kennedy appeared to be doing well post-operatively and was advised to continue to progress to his normal activities as tolerated. (R. at 21.) The ALJ also noted that Kennedy complained of increased pain in August 2018, but he also reported pain relief from medications and rehab. (R. at 21.) In 2019, Kennedy reported significant pain relief from pervious medial branch blocks, radiofrequency ablations and SI joint injections; thus, enabling him to work seven days a week. (R. at 21.) "If a symptom can be reasonably controlled by medication or treatment, it is

not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). In addition, the ALJ noted that, although Kennedy had some positive findings such as lumbar spine tenderness and painful hip range of motion, he had a normal gait, his strength was 5/5 with normal tone and no atrophy; he had symmetric reflexes and intact sensation throughout; and his straight leg raising tests were negative. (R. at 21.)

The ALJ found Kennedy's allegations concerning his neck and upper extremities to be partially consistent with the record. (R. at 22.) The ALJ noted the record indicated that surgery had been "discussed" as early as 2014, but Kennedy did not want to proceed with surgery. (R. at 23, 1359.) In August 2017, Dr. Pryputniewicz reported Kennedy had no cervical spine tenderness or deformity and full upper extremity, including grip, strength. (R. at 21.) When Kennedy demonstrated some right wrist and thumb pain and sensitivity in February 2018, he still had 5/5 strength without any numbness, edema, warmth or redness. (R. at 23.) Although Kennedy continued to complain of right thumb pain in May 2018, he stated he wanted to do "watchful waiting" for his thumb pain, as it had improved some. (R. at 23.) In July 2018, Kennedy reported doing well and a repeat cervical MRI showed multilevel degenerative disc disease, but no new findings. (R. at 23.) Examination of Kennedy's neck showed he had full range of motion. (R. at 23.) In July 2020, Kennedy's examination showed no specific report of neck pain or muscle weakness. (R. at 23.)

The ALJ also found Kennedy's allegations concerning his coronary artery disease, diabetes mellitus, obesity and syncope to be partially consistent with the record. (R. at 23.) The ALJ noted these chronic conditions appeared to be relatively stable overall with routine treatment. (R. at 23.) For example, a stress test in June 2017 was interpreted as low risk. (R. at 23.) While Kennedy's diabetes continued to be characterized as uncontrolled, he was reportedly asymptomatic. (R. at 24.)

Kennedy reported he checked his blood sugar levels sporadically, he reported poor compliance with dietary recommendations, yet denied hypoglycemia. (R. at 24.) A pharmacologic stress test in December 2018 showed a normal left ventricle ejection fraction and no significant ischemia, while an echocardiogram showed an ejection fraction of 55 percent. (R. at 24.) In December 2019, x-rays of Kennedy's chest were normal. (R. at 24.) In July 2020, Kennedy reported he felt tired occasionally but denied other symptoms, including dizziness, headaches, leg swelling, palpitations or shortness of breath. (R. at 24.) His physical examination showed normal findings, with no edema noted. (R. at 24.) Furthermore, in March 2020, Kennedy was offered and refused bolus insulin because it did not "fit with his erratic schedule.

In evaluating the severity of mental impairments, the ALJ must first determine the degree of functional loss in four areas considered essential to the ability to work: (1) understanding, remembering or applying information; (2) interacting with others; (3) the ability to concentrate, persist or maintain pace; and (4) adapting or managing oneself. *See* 20 C.F.R. § 404.1520a(c)(3) (2021). These areas are rated on the following five-point scale: none, mild, moderate, marked and extreme. *See* 20 C.F.R. § 404.1520a(c)(4) (2021). The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. *See* 20 C.F.R. § 404.1520a(c)(4). If a claimant's degree of limitation in all these areas is rated as "none" or "mild," the Commissioner generally will find that the claimant's impairment is not "severe" unless the evidence otherwise indicates that there is more than a minimal limitation in the ability to do basic work activities. *See* 20 C.F.R. § 404.1520a(d)(1) (2021).

Here, the ALJ found Kennedy had no to mild limitations in all four areas. (R. at 14-15.) As the ALJ's decision details, the medical evidence documents scattered reports of anxiety, but "little in the way of psychiatric treatment" other than routine

medication management. (R. at 14.) Examinations showed Kennedy was fully oriented, he exhibited no obvious mood disorder, and his mood, affect and behavior were normal. (R. at 14.) In July 2020, Kennedy described his anxiety symptoms as occasional and mild. (R. at 14.) Kennedy reported he did not need reminders for care of personal needs or to take his medications. (R. at 15.) He testified that his ongoing duties at his furniture store included reviewing financial information about the business on a routine basis. (R. at 15.) Thus, the ALJ found Kennedy did not suffer from a severe mental impairment.

In addition, the ALJ noted that Kennedy's reported activities of daily living indicated he could perform a limited range of light work. (R. at 24.) In May 2017, Kennedy reported he was still "working full-time as a home décor salesperson" and had not missed any work due to symptoms. (R. at 24.) In August 2018, Kennedy reported he had been very busy since his surgery with his design business. (R. at 24.) He was able to travel to Las Vegas and Boulder, Colorado in 2018. (R. at 24.) In November 2020, he reported working seven days a week. (R. at 24.) Kennedy also reported being able to care for himself, do household chores, work, shop and walk for exercise. (R. at 24.) The ALJ explained that, although Kennedy's ongoing work activity did not quite rise to the level of substantial gainful activity, the ongoing work activity was not entirely consistent with his allegations about the severity of his symptoms and degree of functional loss. (R. at 24.) Thus, the ALJ found that Kennedy did not suffer from a severe mental impairment.

Based on this, I find substantial evidence exists to support the ALJ's consideration of the medical evidence and his residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Kennedy was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Kennedy's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also

receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      September 1, 2022.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE